UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FOSTER FARMS, LLC,<br>FOSTER POULTRY FARMS<br><br>　　　　Defendants<br>v.<br><br>SECHLER FAMILY FOODS, INC.<br><br>　　　　Plaintiff | Misc. Case No. _____ |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO COMPEL THE DOCUMENT PRODUCTION OF BELL & EVANS**

The document subpoena at issue in this action relates to *In re Broiler Chicken Antitrust Litig.*, Case No. 16-cv-08637 (N.D. Ill.) (hereinafter "*Broilers*")—a series of class actions and direct actions filed by nearly every major purchaser and distributor of broiler chicken in the United States. *See* Ex. A. Those cases have been consolidated before Judge Thomas M. Durkin in the U.S. District Court for the Northern District of Illinois since late 2016. The Plaintiffs allege that 21 manufacturers of broiler chicken, a bank, and a service that provides benchmarking reports to broiler chicken suppliers conspired to cut the supply of broiler chicken, improperly manipulate an industry index kept by the Georgia Department of Agriculture (known colloquially as the "Georgia Dock"), and rig bids for sales of a particular type of chicken (known as a "small bird") sold to certain national quick service restaurant chains between 2008 and the present. *See* Ex. A. Defendants deny that there was any such conspiracy. Instead, their pricing and production changes were the result of unilateral and non-conspiratorial decisions driven primarily by responses to

1

macroeconomic factors, such as rapidly increasing input costs and the Great Recession. Discovery in the case is ongoing, and scheduled to close on June 11, 2021.[1]

Defendants' document subpoena to Sechler Family Foods d/b/a Bell & Evans ("Bell & Evans") is critical to their defenses in the case. Over four months ago, Defendants served a Rule 45 subpoena on Bell & Evans requesting documents regarding Defendants' defenses in *Broilers*. *See* Ex. B. Specifically, Defendants sought documents from Bell & Evans demonstrating that a chicken company that is not alleged to have participated in the alleged conspiracy experienced the same pressures from macroeconomic factors as Defendants did, thereby refuting Plaintiffs' constant refrain that Defendants were pointing to those factors to cover up a multiyear, industry-wide conspiracy to suppress supply and raise prices.

On January 18, 2021, Bell & Evans objected to these requests as overbroad, irrelevant, disproportionate, and unduly burdensome and refused to produce a single document in response to Defendants' requests. *See* Ex. C. Over the next three months, Defendants met-and-conferred with Bell & Evans multiple times by telephone and significantly narrowed their document requests in order to resolve those objections. *See* Medlock Decl. at ¶¶ 8–9. For example, while Defendants initially sought "Documents sufficient to show any instance in which You have raised the prices that You charged for Broilers, including the reasons for the price increase," *see* Ex. B at ¶ 12, Defendants agreed to limit that request to documents regarding the impact of macroeconomic factors on Bell & Evans' pricing and production decisions, *see* Medlock Decl. at ¶ 10. Moreover, Defendants dropped several of their document requests to Bell & Evans in order to focus on a narrow set of documents that Defendants need to support their defenses. *See* Medlock Decl. at

---

[1] Because of the years of experience that Judge Durkin and Magistrate Judge Jeffrey T. Gilbert have in closely managing discovery in *Broilers*, Defendants have filed a contemporaneous motion to transfer this matter to the U.S. District Court for the Northern District of Illinois.

¶ 10.  Regardless of any objections that Bell & Evans may have had to the breadth of Defendants' initial document requests, what Defendants are now seeking is exceedingly narrow.  Defendants are only seeking documents sufficient to show whether and how Bell & Evans made chicken production and pricing decisions in response to macroeconomic factors, such as the rising price of corn, the Great Recession, and export bans on sales of chicken outside the United States.

But Bell & Evans has refused to produce *any* documents.  It claims that it does not have any relevant documents because it does not produce "Broilers" as defined in the Complaint.  But that is beside the point.  Defendants are seeking documents from Bell & Evans precisely because they are not defendants and claim to produce a premium chicken product.  If non-defendants and non-broiler producers responded in the same way to the same economic stimuli that *strengthens* Defendants' argument that they had a non-conspiratorial self-interest in rationalizing their chicken production in response to macroeconomic factors.  In light of the relevance of these documents, Defendants' substantial need for them, and the fact that Defendants' substantially narrowed requests do not raise burden or proportionality concerns, Defendants request that the Court order Bell & Evans to produce documents in response to Defendants' narrowed request.

I. **RELEVANT BACKGROUND**

Bell & Evans is non-party chicken producer based in Fredericksburg, Pennsylvania that produces antibiotic free and organic chicken.  *See* Ex. D (https://www.bellandevans.com/our-standards/).  Unlike many of the Defendants, Bell & Evans does not participate in Agri Stats, the National Chicken Council, the U.S. Poultry & Egg Association, or the Georgia Poultry Federation.  Nor does it appear to base its pricing off of the Georgia Dock.  Because of these distinguishing factors, Defendants seek information from Bell & Evans in order to demonstrate that chicken producers outside of the alleged conspiracy experienced the same economic pressures as Defendants and reacted in kind.  Such evidence would demonstrate that Defendants' explanations

for their production and pricing decisions are not just pretext, as Plaintiffs argue, but rather are accurate explanations of the macroeconomic factors impacting the wider broiler industry during the relevant time period.

On December 21, 2020, Defendants served a subpoena on Bell & Evans requesting a documents related to the impact of external macroeconomic factors on Bell & Evans' production and pricing decisions. *See* Exs. B, E. On January 18, 2021, Bell & Evans sent Defendants its responses and objections to the subpoena. Ex. C. Bell & Evans explained that because it produces specialty chicken, it is not part of the "Broiler" market alleged in the Complaint, and thus any documents from Bell & Evans would not be relevant to the claims at issue in this case. *Id.*

In response, Defendants explained that Bell & Evans' documents are relevant **precisely** because it claims to be distinct from the rest of the chicken market. As such it is good test case for a natural experiment: How did non-defendant chicken producers, such as specialty chicken producers, respond to the same macroeconomic factors during the alleged conspiracy period? While Defendants have repeatedly told Bell & Evans that they are willing to work with the company to address concerns about burden and proportionality, Defendants maintain that the answer to that question is relevant to the claims and defenses in this litigation.

A quick perusal of the Plaintiffs' prolix complaints and Defendants' response to them shows that Bell & Evans' documents are clearly relevant. As a quick review, Plaintiffs allege that 21 chicken companies, a bank, and a benchmarking service banded together and conspired for over a decade to fix the price of thousands of chicken products using various means. Defendants respond that their production and pricing decisions were driven by macroeconomic factors. If a chicken company does not balance its supply of chicken and its customers' demand for chicken, it can quickly find itself in a disastrous position. If a company is "long" on chicken, meaning that it

has more chicken on hand than it can sell, it will be forced to put chicken into freezer storage, which significantly increases the cost basis of producing chicken. If a company is "short" on chicken, it will not have enough chicken to cover the sales that it is contractually obligated to make, and the company must either purchase chicken on the spot market to cover its shorted sales or deal with an unhappy customer. And chickens are not widgets. They are living, breathing animals—making it difficult for chicken companies to know with precision how many broiler chicken eggs will hatch, the number of broiler chicks that will live to maturity, and the weights that those chickens will reach when they are at the proper age to be slaughtered.[2] Therefore, it is in a chicken company's non-conspiratorial self-interest to reduce its supply of broiler chickens when its broiler chicken supply and demand are out of balance.

Plaintiffs retort that nearly every macroeconomic factor that Defendants pointed to as a reason for making the difficult decisions necessary to balance supply and demand were really just an attempt to cover-up their nearly industry-wide Rube Goldberg conspiracy. *See, e.g.*, Ex. A at ¶ 406-07, Dkt. No. 4244 (calling Foster Farms' explanation for its decision to delay expansion due to escalating grain and fuel prices "pretextual."); ¶ 408–09 (calling O.K. Foods' explanation for its decision to reduce egg sets due to "'record high prices for corn and soybeal meal' . . . pretextual."); ¶ 932 (calling the avian flu in Mexico a "pretext" to export chickens to Mexico); ¶ 1013 ("Defendants affirmatively and falsely attributed rising prices to, among other things, increases in the price of inputs. Defendants used these pretexts used to cover up the conspiracy.");

---

[2] For example, broiler chickens eat less feed during the summer months, which can make it difficult for chicken companies to grow chickens to the weights specified by their customers. Being "out of spec" can also put chicken companies in a difficult position. For instance, a grocery chain may reject a rotisserie chicken if it is a few tenths of a pound too heavy or too light, leaving the chicken company with an out of spec product.

¶ 1016 (listing Defendants' statements about the impact of the fuel mandate as "pretextual explanations" for increased prices).

That is where Bell & Evans comes in. Under Plaintiffs' theory of the case, Bell & Evans should have responded to the financial collapse of the Great Recession, multiple chicken industry bankruptcies, and sky rocketing input costs by simply continuing to constantly increase chicken production. Defendants seek Bell & Evans' documents to demonstrate that is not true. Bell & Evans' documents will likely show that, like Defendants' executives, the executives of Bell & Evans were rationale economic actors—they responded to demand and supply shocks by altering their production and pricing strategies. All Defendants seek are document sufficient to show whether that was the case.

Bell & Evans has raised concerns that the subpoena is unduly burdensome. Setting aside the fact that Bell & Evans has never once attempted to explain the time or money that it would take to comply with the subpoena, it is simply untrue that the subpoena would impose any undue burden on Bell & Evans. For almost three months, Defendants did everything in their power to come to a compromise with counsel for Bell & Evans over the documents requested. Over the course of several meetings, Defendants significantly narrowed their requests. When Bell & Evans told Defendants that it did not have access to transactional data from prior to 2016 because the data was in storage and Bell & Evans did not have the software to read the data, rather than demand Bell & Evans purchase the required software to search its documents, Defendants accepted that representation and narrowed their request to non-transactional data. In light of Bell & Evans' concerns about getting dragged into the case as a last-minute addition to Plaintiffs' ever-growing list of defendants and legal theories, Defendants represented that they would be open to forgoing a deposition if Bell & Evans would produce the documents requested. Defendants also asked

multiple times for an estimate of Bell & Evans' costs of complying with the subpoena, which Defendants offered to bring to the Joint Defense Group to discuss potential reimbursement. Bell & Evans never provided Defendants with a proposal. In short, Defendants continued to accept Bell & Evans' representations, make adjustments, and work toward a compromise, while Bell & Evans seemingly ran out the clock before doubling down on its original objection that it has no relevant documents because it is not a "Broiler" chicken company as defined in the *Broilers* complaint.

Defendants did everything they could to ease the burden on Bell & Evans and reach a mutually agreeable solution, but Bell & Evans would not compromise and refused to comply with the subpoena. In light of that refusal, Defendants respectfully request that the Court order Bell & Evans to comply with the subpoena by producing documents sufficient to show whether and how Bell & Evans made chicken production decisions in response to macroeconomic factors.

## II. STANDARD OF LAW

A subpoena may require a non-party to "produce designated documents, electronically stored information, or tangible things in that person's possession, custody, or control." Fed. R. Civ. P. 45(a)(1)(A)(iii); *see Rossman v. EN Eng'g*, LLC, 467 F. Supp. 3d 586, 590 (N.D. Ill. 2020). "A party has a general right to subpoena any person to appear at a deposition or to produce documents for inspection and copying." *Thayer v. Chiczewski*, 257 F.R.D. 466, 469 (N.D. Ill. 2009). However, "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." In deciding a motion to compel, district courts must consider "such factors as timeliness, good cause, utility, and materiality." *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 993 (7th Cir. 2002).

### III.     ARGUMENT

The Court should enter an order compelling Bell & Evans to produce documents responsive to Defendants' Rule 45 subpoena regarding the impact of macroeconomic factors on Bell & Evans' pricing and production decisions.  Where discovery "appears relevant, the party objecting to the discovery request bears the burden of showing why that request is improper." *West v. Miller*, 2006 WL 2349988, at *2 (N.D. Ill. Aug. 11, 2006) (citing cases); *see also In re Folding Carton Antitrust Litig.*, 76 F.R.D. 420, 427 (N.D. Ill. 1977) (granting defendants' motion to compel where information sought was relevant to potential overcharge defense).  While courts are cognizant of the "unwanted burden" placed on non-parties facing discovery requests and pay non-party status "special weight," courts must balance the "competing needs" of the parties to determine whether discovery is appropriate.  *Rossman*, 467 F. Supp. 3d at 590.  In other words, "the relevance and proportionality limits in Rule 26 that guide the proper scope of discovery apply with equal force to nonparty discovery under Rule 45." *DeLeon-Reyes v. Guevara*, 2020 WL 3050230, at *3 (N.D. Ill. June 8, 2020).

When determining whether a subpoena imposes an undue burden on a non-party, courts consider whether: "(1) the information requested is relevant; (2) the party requesting the information has a substantial need for the documents; (3) the document request is overly broad; (4) the time period the request covers is reasonable; (5) the request is sufficiently particular; and (6) whether compliance with the request would, in fact, impose a burden on the subpoenaed party." *Little v. JB Pritzker for Governor*, 2020 WL 1939358, at *2 (N.D. Ill. Apr. 22, 2020) (citing *Am. Soc. of Media Photographers, Inc. v. Google, Inc.*, 2013 WL 1883204, at *2 (N.D. Ill. May 6, 2013)).  Each of these factors weighs in favor of granting Defendants' motion to compel.

8

### A. Documents from Non-Conspirators are Highly Relevant to this Case to Dispute Plaintiffs' Argument that Defendants' Defenses are Pretext.

The information sought from Bell & Evans is relevant to the lawsuit and Defendants have a substantial need for the information. *See Northwestern Mem. Hosp. v. Ashcroft*, 362 F.3d 923, 927 (7th Cir 2004). "Requests for discovery are relevant if there is **any** possibility that the information sought may be relevant to the subject matter of the action." *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447, 450 (N.D. Ill. 2006) (emphasis added). Here, Bell & Evans argues that because it does not produce broiler chicken, it has no relevant information and need not comply with the subpoena. As Defendants explained to Bell & Evans numerous times over the course of more than three months negotiating the terms of the subpoena, this is a misunderstanding of the purpose behind Defendants' requests. Defendants do not dispute that Bell & Evans is different from Defendants in this litigation; in fact, it is precisely because of these differences that Defendants believe documents from Bell & Evans would be pivotal to help dispute Plaintiffs' claim that Defendants' explanations for their production and pricing decisions over the relevant time period are false.

In addition to denying the existence of any conspiracy or agreement, Defendants point to certain exogenous macroeconomic factors that contributed to some of the Defendants' production and pricing decisions during the relevant period. Specifically, Defendants point to the skyrocketing cost of corn (a key input in chicken feed), which drastically increased the cost of producing chicken and threatened Defendants with massive financial losses. The Court need not look further than Plaintiffs' Complaints to find evidence of Plaintiffs' blanket denial of the impact of these external economic factors on Defendants' businesses. For one of many examples, in paragraph 462 of the DAPs' Amended and Consolidated Complaint, under a section titled "Defendants Continued Their Conspiracy With a Second Massive Breeder Flock Cull in 2011,"

9

Plaintiffs point to an announcement by House of Raeford announcing a 2011 reduction of egg sets as evidence of the conspiracy.  Ex. A at ¶ 462.  The cited press release from House of Raeford states, "if Congress will take action to cut unreasonable government support for the ethanol industry, then grain prices should decrease to a more manageable pricing level." *Id.*  Under the same "conspiracy" heading, Plaintiffs also cite a 2011 decision by Simmons to lay off workers "[d]ue to economics specific to our industry, resulting from high grain prices predominantly caused by corn being used in ethanol." *Id.* ¶ 464.  Plaintiffs rely on decisions (and explanations) such as these as proof of a massive conspiracy to cut production and raise prices, ignoring Defendants' legitimate explanations as a mere cover for the underlying conspiracy. Evidence that Bell & Evans experienced the same constraints due to elevated grain prices and reacted in kind would be directly relevant to Defendants' argument that there was no industry-wide conspiracy; rather, there were macroeconomic factors impacting the industry in the same way during the relevant time period.

Defendants also have a substantial need for documents from Bell & Evans, one of the few chicken producers that is not implicated in the allegations in the Complaint.  This is not a situation where Defendants seek "duplicative or cumulative" non-party discovery that could have been obtained by a party to this litigation.  *Rossman*, 467 F. Supp. 3d at 590.  By definition, the information sought is not obtainable from parties to this litigation because the Defendants are all alleged conspirators, and as Plaintiffs' Complaints make clear, Plaintiffs reject any of Defendants' legitimate explanations for the pricing and production decisions that occurred during the relevant time period.

Though courts must be cognizant of non-party status, the fact that an entity is not a party to the litigation is not a reason to deny the requesting party relevant information.  In *In re Domestic*

*Drywall Antitrust Litig.*, 300 F.R.D. 234, 240–41 (E.D. Pa. 2014), a case concerned with alleged price-fixing in the drywall industry, Plaintiffs sought to subpoena a series of reports and communications about the drywall industry from a non-party. The court balanced the competing interests and ultimately allowed such discovery, finding that Plaintiffs met the "higher relevancy burden required for nonparty discovery" by demonstrating that (1) "the requested materials are reasonably calculated to lead to information related to the pricing behaviors of drywall manufacturers during the period of the alleged conspiracy," and (2) "at least one of the [requested] reports specifically discusses this subject matter."  Here, Defendants have met that higher burden by demonstrating that Bell & Evans would have relevant information regarding the macroeconomic factors impacting the poultry industry during the relevant time period—information that Plaintiffs could not dismiss as cover up for a conspiracy because it would come from a non-conspirator.

Because the information sought from Bell & Evans is highly relevant to Defendants' defenses and Defendants have a substantial need for such evidence, this Court should order Bell & Evans to produce the narrowed set of documents that Defendants are requesting.

> **B.    As Negotiated, the Subpoena is Narrowly Tailored and Does Not Unduly Burden Bell & Evans**

Defendants' requests are narrowly tailored to avoid unduly burdening Bell & Evans. Far from being overly broad, Defendants significantly narrowed their requests over the course of several meetings with Bell & Evans to four particular categories of documents: (1) documents sufficient to show the impact of input costs (including corn, soy, and grain) on production and pricing; (2) documents relating to decisions whether to increase or decrease production; (3) documents sufficient to show the impact of external economic factors, such as the Great Recession, on production and pricing; and (4) documents sufficient to show the relationship

11

between price and Bell & Evans' status as a premium chicken producer. These requests are limited (and in some cases overlapping), and encompass only a small subset of Bell & Evans' business decisions over the relevant time period.

The time period covered in the subpoena was also originally limited to the same time period that this Court accepted as sufficient and not unduly burdensome for this litigation: January 1, 2007 through December 31, 2019. *See In re Broiler Chicken Antitrust Litig.*, 2017 WL 6569720, at *4 (N.D. Ill. Dec. 22, 2017). However, when Bell & Evans told Defendants that it did not have any pre-2010 documents, Defendants accepted that representation and agreed to only seek post-2010 documents. Defendants also accepted Bell & Evans' representation that structured data from pre-2016 was unavailable (or very difficult to access), and Defendants agreed to forgo seeking those documents. Accordingly, Defendants are not seeking structured data relevant to these four discreet categories.

Consequently, it will not be unduly burdensome for Bell & Evans to comply with this subpoena, which Defendants negotiated and narrowed in good faith for nearly three months. Though any entity may be concerned about turning over proprietary documents, courts routinely find that protective orders are sufficient to safeguard such information. *See In re Subpoena to Creeden & Assocs., Inc.*, 2012 WL 4580841, at *2 (N.D. Ill. Sept. 28, 2012) (granting in part motion to enforce subpoena against third-party respondent subject to the parties agreeing to a protective order). Here, a strong protective order is already in place, which was subject to lengthy negotiations between Plaintiffs and Defendants, all of whom have had to turn over highly sensitive business information, and thus had every motivation to ensure any documents produced would be sufficiently protected. *See* Agreed Confidentiality Order, *Broilers* Dkt. 202. Thus, any concerns Bell & Evans may have over sharing proprietary information is sufficiently mitigated.

Finally, in addition to the fact that the subpoena requests a narrow set of documents, Defendants offered to further reduce any burden on Bell & Evans by offering to help cover the cost of Bell & Evans' production. Despite the fact that Defendants asked multiple times for a cost estimate to take back to the Joint Defense Group for consideration, Bell & Evans never provided any cost estimate, belying their lack of cooperation and underlining their intent to refuse to comply with the subpoena.

### C. The Subpoena is Proportional to the Needs of the Case

For all the above reasons, the negotiated subpoena requests are also proportional to the needs of the case under Federal Rule of Civil Procedure 26. When determining proportionality, courts consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). As explained above, Defendants' argument that their production and pricing decisions can be explained by macroeconomic factors and not an industry-wide conspiracy are key to the issues in this case—namely, whether Defendants engaged in a conspiracy to suppress production and raise Broiler prices. The amount in controversy for Defendants is massive. For a sense of the scope of liability Defendants are facing, the six settling Defendants in the *Broilers* litigation have already deposited $170,261,600.00 into escrow. *Broiler* Dkt. 4551 at 1. If the remaining Defendants could get out of the case after summary judgment as opposed to after trial, the cost savings would be even more enormous. As explained above, Defendants do not have access to information about the way non-alleged conspirators reacted to macroeconomic factors because they are all alleged conspirators, and Plaintiffs reject their explanations for their behavior as pretext. Lastly, the benefits of this discovery vastly outweigh

13

any burden. Defendants significantly narrowed their requests and have offered to consider reimbursement for Bell & Evans' costs of complying with the subpoena. While Bell & Evans is just one company, Defendants represent 21 different Broiler producers who face hundreds of millions of dollars in liability if they are found culpable of the behavior alleged by Plaintiffs. All of these companies would all benefit from discovery into the impact of macroeconomic factors on non-alleged conspirators, and those benefits would outweigh any burden placed on Bell & Evans.

## IV.    CONCLUSION

In *In re Subpoena to Creeden & Assocs., Inc.*, the court observed that the movant's credibility suffered from the outset because it had produced absolutely no documents to the requesting party. 2012 WL 4580841, at *2. "Parties may reasonably disagree over the scope of a subpoena, but it is still, nonetheless, a subpoena, which is a command of the Court. Turning over nothing in response to that command suggests less than a full willingness to cooperate." *Id.* Here, Bell & Evans has produced ***nothing*** in response to the Subpoena despite Defendants' numerous attempts to cooperate. Defendants' have been, and continue to be, willing to work with Bell & Evans to address the company's concerns about burden and proportionality, but the answer cannot be that Bell & Evans will produce nothing in response to a valid subpoena seeking relevant information. For the foregoing reasons, this Court should order Bell & Evans to produce documents regarding the impact of macroeconomic factors on Bell & Evans' pricing and production decisions.

Dated: May 4, 2021                                               Respectfully submitted,

MAYER BROWN LLP

By: */s/ Alison T. Gelsleichter*
Alison T. Gelsleichter (PA 308794)
Carmine R. Zarlenga*
Stephen M. Medlock*
Oral D. Pottinger*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300
agelsleichter@mayerbrown.com
czarlenga@mayerbrown.com
smedlock@mayerbrown.com
opottinger@mayerbrown.com
\**pro hac vice* motions to be filed

*Attorneys for Defendant Foster Farms, LLC and Foster Poultry Farms, a California Corporation*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on May 4, 2021, the foregoing document was served via electronic mail on opposing counsel.

                                        /s/  *Alison T. Gelsleichter*
                                        Alison T. Gelsleichter